Albert G. Kroll, Esq. (AGK-5940)
Seth Ptasiewicz, Esq. (SP-8875)
**KROLL HEINEMAN CARTON, LLC**
Metro Corporate Campus One
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Tel: (732) 491-2100
Fax: (732) 491-2120

Benjamin Y. Kaufman, Esq. (BYK-1863)
Kevin Cooper, Esq. (KC-3244)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Alan Fein and Ariel Fein, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiffs, | ) Civil Action No. ) **CLASS ACTION COMPLAINT** |
| v. | ) ) |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER and ROBERT L. ROSIELLO, | ) ) ) ) ) |
| Defendants. | ) **JURY TRIAL DEMANDED** ) |

Plaintiffs Alan Fein and Ariel Fein ( together "Plaintiffs"), individually and on behalf of

all other persons similarly situated, by their undersigned attorneys, for their Complaint against

defendants, allege the following based upon personal knowledge as to themselves and their own

acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through their attorneys, which included, among other things, a review of

defendants' public documents, conference calls and announcements made by defendants, Securities and Exchange Commission filings, wire and press releases published by and regarding Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), analysts' reports and advisories about the Company, and information readily available in the public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons and entities who purchased or otherwise acquired Valeant securities between February 22, 2015 and October 21, 2015, inclusive (the "Class Period"), against the Company and certain of its officers and directors for disseminating materially false and misleading statements about the Company's true financial condition, business prospects, and practices.

2.      Valeant's unsavory business practices have made headlines throughout the world. Simply stated, Valeant has completed numerous acquisitions of pharmaceutical companies over a very short period of time and subsequently jacks up the prices exponentially of the underlying pharmaceuticals.   The Company then slashes research and development at the acquired companies thereby not developing new medicines. Premised on this, the Company's most recent quarterly report states the Company has $985 million in cash and cash equivalents but only $81 million in research and development expenses.

3.      Since 2010, the Company has acquired companies with a total value of at least $36 billion, mostly in the United States. In 2010, the predecessor to Valeant, based in California, was acquired by Biovail, a Canadian company. It relocated to Canada, a jurisdiction with a lower tax rate and the combined operations were named Valeant.

4.      According to a recent congressional report on the impact of the United States tax code on corporate activities published in July by the Senate Permanent Subcommittee on Investigations, by moving to Canada, Valeant lowered its statutory tax rate to 27 percent from 35 percent.  Even so, the extent Valeant is able to escape taxes is far greater. The report found that its actual cash tax rate is far lower, having fallen to 3.3 percent last year from 5.9 percent in 2010.

5.      This extremely low tax rate fueled the Company's rapid expansion by acquisition, according to Howard B. Schiller, a Valeant director and its former chief financial officer. He told Senate investigators, "[t]here is no question that we would not be in the same place we are in today if we had a higher tax rate."

6.      Accordingly, Valeant has availed itself of very competitive tax rates in a foreign jurisdiction to facilitate acquisitions.  The Company then jacks up the prices of the pharmaceuticals but does not use any of the sales proceeds to fund research and development of news drugs (an argument often advanced by the pharmaceutical lobby to justify ever increasing prices is that the money goes to research for new medicines).  Valeant, however, has no interest in the advancement of medicine to cure ailments.  It is engaged in naked profiteering.

7.      The Company's practices have attracted the attention of federal investigators.  On or about October 13, 2014, the Company reportedly received two federal subpoenas related to its pricing, distribution and patient support practices.  The subpoenas were issued by the United States attorney's offices in Manhattan and Massachusetts.

8.      The Company reported that the material requested mostly concerned the Company's patient assistance programs and requests related to distribution of the Company's drugs.  Patient assistance programs constitute when a company covers a patient's co-payment.  It

assists patients in getting a drug they might not otherwise be able to afford. However, that means that Medicaid, Medicare, or commercial insurers have to pay for the drug.

9.     In the wake of the report that the Company received subpoenas, its stock declined $8.42 per share, or 4.75%, to close at $168.87 on October 15, 2015. *Bloomberg* reported that U.S. Senator Claire McCaskill stated via email that "[i]t appears obvious to me that Valeant has been anything but responsive or transparent - it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

10.     On October 19, 2015, the Company reported its third quarter 2015 financial results and convened an earnings conference call. Even though the Company raised its fourth quarter and full year 2015 revenue and earnings per share guidance, the price of Valeant stock declined 7.7% that day premised on a disclosure that it intended to modify its business model. Also, market professionals and analysts began to question a previously undisclosed connection between the Company and a specialty pharmacy called Philidor Rx Services, LLC ("Philidor").

11.     The Company presented a slide deck to investors during the conference call designed to address what the Company knew would be a plethora of questions concerning Philidor and its business practices. The deck represented in part the following:

(a)     We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages.

(b)     Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.

(c)     We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients.

(d)     In almost all cases, our inventory with specialty pharmacies and the title for our medicines only transfer to the pharmacy when the actual prescription is filled – this significantly reduces our distribution fees and product returns less than 5% of our U.S. channel inventory sits in the specialty pharmacy channel.

(e)     Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our copay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor.

(f)     Based on a VIE (variable interest entity) assessment in accordance with ASC 810, we consolidate the financials of Philidor. Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory.

(g)     For many of our dermatology products, many of our specialty pharmacies, including Philidor, dispense Valeant medications before adjudication of the reimbursement may be finalized. Patients get their medicines more quickly and Valeant takes the risk for non-reimbursement.

12.     The deck further informed concerning the Philidor relationship:

(a)     [Philidor] [p]rovides services under our programs for commercially insured and cash paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs.

(b)     [Philidor] [d]oes not restrict prescriptions it fills to any particular manufacturers (including Valeant).

(c)     [Philidor] [d]ispenses generic products as specified in patient's prescription or as requested by patient.

13.     Importantly, Defendant Pearson admitted that the Company omitted to disclose the nature of Philidor relationship and that "an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies."

> The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.

14.     The deck further addressed another mysterious entity named R&O Pharmacy, LLC ("R&O") in a slide entitled, "Why did Valeant's General Counsel send a letter inquiring about the $69M owed to Valeant by R&O pharmacy?"

15.     The slide states that "R&O is one of the specialty pharmacies in our network" and that Valeant "shipped approximately $69 million at WAC" to R&O, representing approximately "$25 million in net revenue to Valeant," and that R&O "sold a substantial amount of Valeant product" but was "improperly holding significant amounts it received from payers." Pearson also said that inventory held by R&O remains on Valeant's financial statements.

16.     On October 20, 2015, *The New York Times* published an article entitled *Drug Makers Sidestep Barriers on Pricing* by Andrew Pollack.  The article points out insurers are frustrated with the ever increasing price of drugs and pharmaceutical manufacturers like Valeant have found a way "to circumvent efforts of insurers and pharmacists to switch patients to the generic components, or even to the over-the-counter versions."

17.     The practice is called "Prescriptions Made Easy" whereby instead of sending their patients to the drugstore with a prescription, doctors submit prescriptions directly to a mail-order specialty pharmacy affiliated with the drug company.

18.     The affiliated pharmacy then mails the drug to the patient and deals with the insurance companies.  This prevents the doctor from dealing with reimbursement issues "that might otherwise discourage them from prescribing such an expensive drug."

19.     According to the *NY Times*, "[u]se of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services."

20.     Philidor is a curious entity as depicted by the *NY Times*.  "It was denied a license in California in 2014 because, the state said, its application had not truthfully identified its owners and financial officers."  Valeant, however, recently revealed on its quarterly earnings call that it had purchased an option to acquire Philidor in late 2014.  J. Michael Pearson, Valeant's chief executive also disclosed that Philidor's results are consolidated into Valeant's financial reports.

21.     Thereafter on October 21, 2015, Citron Research published a report  entitled, "Valeant: Could this be the Pharmaceutical Enron?" In a detailed report, Citron asked why would  the Company "be secretly maneuvering to buy a little known pharmacy with a dubious ownership structure" and "[w]hy was this entity NEVER disclosed in any prior company disclosure?"

22.     Citron argued that Valeant is using a network of specialty mail-order pharmacies that Valeant actually controls to buttress sales of its high priced drugs and to keep patients and their insurance companies from switching to less costly generics.

23.     The Citron report also referred to an investigative report authored by an organization called Southern Investigative Reporting Foundation that further questioned the nature of Valeant's relationship with specialty pharmacies.

24.     In sum, Citron asserts that Philidor, and another specialty pharmacy tied to Valeant, R&O, are actually the same company with the same management. The Citron report is supported by documents from both the R&O and Philidor websites indicating that the two companies were interrelated, including overlapping privacy notices, identical toll-free numbers to reach their privacy officer, and a facsimile number from the R&O website that linked to Philidor.  Moreover, Citron stated that "it appears thatValeant/Philidor have created an entire network of phantom captive pharmacies. . . the same privacy notice appears on several other 'ghost ship' putative pharmacy websites."

25.     Citron's ultimate conclusion was that Valeant was using a secret relationship with Philidor to store inventory and record those transactions as sales even though the transactions are not in fact sales.

26.     The market punished the Company on this news. On October 21, 2015, trading was halted in Valeant shares. When trading resumed, Valeant shares fell nearly 40%, triggering another trading halt. Intra-day, the Company fell nearly $60 a share and closed down approximately 19%, or $28.42 per share.

27.     After the market closed, Philidor issued a press release admitting it maintained a contractual relationship with "affiliated pharmacies," including R&O, and stating that Philidor

"does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

28.     The stock declined again the next day after a historically "bullish" analyst - BMO Capital Markets - stated it "cannot defend the specialty structure" and downgraded the shares to "market perform." BMO's report stated, "[w]e've been strong, vocal Valeant bulls" but that "we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."

## JURISDICTION AND VENUE

29.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

32.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

33.     Plaintiffs Alan Fein and Ariel Fein purchased Valeant securities during the Class Period, as set forth in the certification attached hereto, and have been damaged thereby.

34.   Defendant Valeant Pharmaceuticals International, Inc. is incorporated in British Columbia, Canada and has its United States headquarters in this District. Shares of Valeant stock trade on the NYSE under the ticker symbol "VRX."

35.   Valeant develops, manufactures, and markets pharmaceuticals, over-the-counter products, and medical devices worldwide. The Company offers Solodyn to treat red and pus-filled pimples of acne in patients, as well as Ziana, Acanya, Atralin, Retin- A Micro, and ONEXTON gel; Wellbutrin XL for major depressive disorder in adults; Jublia for onychomycosis of the toenails; Xenazine for chorea; Targretin for Cutaneous T-Cell Lymphoma; Arestin, a subgingival sustained-release antibiotic; and PROVENGE for the treatment of prostate cancer. It also provides Zovirax, an antiviral for recurrent herpes labialis and initial genital herpes; Syprine to treat patients with Wilson's disease; Elidel to treat atopic dermatitis; Prolensa for inflammation and pain following cataract surgery; Duromine, a weight loss drug; and Lotemax gel for post-operative inflammation and pain.

36.   In addition, the Company offers PreserVision, an antioxidant eye vitamin and mineral supplement; CeraVe to rebuild and repair the skin barrier; ReNu Multiplus to lubricate and rewet soft contact lenses; Biotrue for healthy contact lens wear; Ocuvite, a lutein eye vitamin and mineral supplement; Boston, a cleansing solution for gas permeable contact lenses; Artelac to treat dry eyes; AntiGrippin for acute respiratory and respiratory viral diseases, and influenza; and Bedoyecta, a vitamin B complex product. Further, it provides SofLens daily disposable contact lenses; PureVision, a contact lens; various ophthalmic surgical products; Biotrue ONEday lens; medical device systems for aesthetic applications; and Bausch + Lomb Ultra, a contact lens. Additionally, the company offers Tobramycin and Dexamethasone ophthalmic

suspension for steroid responsive inflammatory ocular conditions; Cardizem CD to treat hypertension and angina; and Latanoprost for the treatment of glaucoma.

37.     Defendant J. Michael Pearson is, and at all relevant times was, CEO and Chairman of Valeant's board of directors.

38.     Defendant Howard B. Schiller was an Executive Vice President and the Chief Financial Officer of the Company until June 30, 2015, when he resigned those positions. Schiller is a member of the Company's board of directors and a consultant to the Company. Defendant Robert L. Rosiello has been the Company's CFO since July 2015 and is also an Executive Vice President of the Company. Defendants Pearson, Schiller, and Rosiello (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Valeant's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

39.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about Valeant. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Valeant stock was a success, as it: (a)

deceived the investing public regarding Valeant's prospects and business; (b) artificially inflated the price of Valeant common stock; and (c) caused Plaintiffs and other members of the Class, as defined below, to purchase Valeant stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Valeant securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Valeant and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

41.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, Valeant common stock was actively traded on an open and efficient market under the symbol "VRX." Record owners and other members of the Class may be identified from records maintained by Valeant and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

42.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     whether defendants participated in and pursued the common course of conduct complained of herein;

(c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's investors during the Class Period misrepresented material facts;

(d)     whether the market price of Valeant securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(e)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

46.     On February 22, 2015, the Company issued a press release reporting its fourth quarter and full year 2014 financial results, and stated that full year 2015 guidance reflecting recent acquisitions, "as well as expected business outperformance" would be "updated on first quarter 2015 earnings call." The press release quoted Pearson as stating:

> Valeant's relentless focus on building diversified, durable businesses with strong organic growth platforms, coupled with disciplined business development, is paying off for all of our stakeholders. Outstanding growth in the U.S., most notably dermatology, offset the negative impact from foreign exchange. In addition, we continued to see strong organic growth in several emerging markets such as China, the Middle East and Russia. With our strong finish to the year, we are well positioned for another year of outperformance in 2015.

47.     Also on February 22, 2015, the Company announced that it agreed to buy Salix for $158 per share, or approximately $14.5 billion, to add gastrointestinal drugs to its line of products.

48.     As reported by Zacks that same day, the Company's earnings were very solid. "Total revenue came in at $8.3 billion in 2014, up 43.2% from 2013, in line with the Zacks Consensus Estimate. Cash earnings per share came in at $8.34, up from $6.24 per share in 2013." Zacks also noted that product sales at amounted to $2.2 billion during the fourth quarter, up 10% year over year. However, "[r]esearch & development expenses were relatively flat year over year at $59.1 million, while selling, general & development expenses increased 16.5% to $524.5 million.

49.     On February 25, 2015, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014. The report was signed by Pearson and Schiller, and contained Sarbanes-Oxley ("SOX") certification signed by each of them stating that the annual report did not contain any untrue statements or omissions of material facts. The 2014 annual

report repeated the financial results found in the February 22, 2015 press release, and also stated, in part:

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure. We have an established portfolio of durable products with a focus in the eye health and dermatology therapeutic areas. We believe these products have the potential for strong operating margins and solid growth and are particularly attractive for a number of reasons including:
>
> - They are largely cash pay, or are reimbursed through private insurance, and, as a result, are less dependent on increasing government reimbursement pressures than other products;
> - They tend to have established brand names and do not rely;
> - They tend to have the potential for line extensions and life-cycle management programs; and
> - They tend to be smaller on an individual basis, and therefore typically not the focus of larger pharmaceutical companies.
>
> Another critical element of our strategy is business development. We have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the acquisitions of Bausch & Lomb Holdings Incorporated ("B&L") and Medicis Pharmaceutical Corporation ("Medicis"). We will continue to pursue value-added business development opportunities as they arise.
>
> The growth of our business is further augmented through our lower risk, output-focused research and development model. This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. This is achieved primarily by:
>
> - focusing on innovation through our internal research and development, acquisitions, and in-licensing;
> - focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services;

- focusing on critical skills and capabilities needed to bring new technologies to the market;
- pursuing life-cycle management programs for currently marketed products to increase such products' value during their commercial lives; and
- acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

50. On March 16, 2015, the Company issued a press release announcing that Valeant and Salix agreed on amended terms to the merger agreement, and that Valeant increased the offer price to acquire all the outstanding common stock of Salix from $158.00 per share to $173.00 per share in cash, for a total value of approximately $15.8 billion.

51. On March 17, 2015, the Company issued a press release announcing that it would issue 7,286,432 shares at a price of $199.00 per share in its $1.45 billion offering of common shares in connection with the Salix acquisition.

52. On March 18, 2015, the Company filed its Prospectus Supplement and Registration Statement for its offering of $1.45 billion of common shares of Valeant in connection with the tender offer for Salix in connection with the merger. The Prospectus stated that shares would be offered at $199 per share. The Prospectus Supplement stated, in relevant part:

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our low selling, general and administrative ("SG&A") cost structure and decentralized operating model to ensure decisions are made close to the customer.
>
> *       *       *
>
> The growth of our business is further augmented through our lower-risk, output-focused research and development model, which allows us to advance certain development programs to drive future revenue growth, while minimizing our research and development expense. This is achieved primarily by:

- sourcing innovation through our internal research and development, as well as through acquisitions and in-licensing;
- focusing on productivity in order to minimize costs through measures such as leveraging industry overcapacity and outsourcing commodity services; focusing on critical skills and capabilities needed to bring new technologies to the market;
- pursuing life-cycle management programs for currently marketed products to increase such products' value during their commercial lives; and
- acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

53.     Discussing the sale of inventory, the Prospectus Supplement stated, in part:

> Even after the inventory held by wholesalers has reached desired levels, wholesalers will make estimates to determine end-user prescription demand, and may not be completely effective in matching their inventory levels to actual end-user prescription demand. In addition to wholesalers, inventory is held at retail pharmacies and other non- wholesale locations over whose buying patterns we will have limited influence. Adverse changes in economic conditions and other factors may cause retail pharmacies to reduce their inventories of the combined company's GI products, which would reduce their orders from wholesalers and, consequently, the wholesalers' orders from the combined company, even if end-user prescription demand has not changed. As a result, changes to inventory levels held by wholesalers may cause the combined company's operating results to fluctuate unexpectedly if the combined company's sales to wholesalers do not match end-user prescription demand.

54.     On April 1, 2015, the Company issued a press release announcing the consummation of its merger with Salix.

55.     On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2015, as well as increased guidance for full year 2015. The press release stated, in relevant part:

2015 First Quarter Results

- Total Revenue $2.2 billion; an increase of 16% over the prior year despite negative foreign exchange impact of $140 million

  - Excluding negative impact of foreign exchange and last year's divestiture of the aesthetics injectable business, revenue increased 27% over the prior year

  \*       \*       \*

- GAAP EPS $0.21; Cash EPS $2.36, an increase of 34% despite negative foreign exchange impact of $0.12 over the prior year

  - Excluding negative impact of foreign exchange and last year's divestiture of the aesthetics injectable business, Cash EPS increased 50% over the prior year

  \*       \*       \*

2015 Guidance

- Increasing Total Revenue to $10.4 - $10.6 billion up from $9.2 - $9.3 billion

- Expect Salix Revenue of ~$1.0 billion in 2015

  - Reflects implementation of wholesaler inventory reduction program; plan to reduce Salix wholesaler inventory levels to approximately 1.5 months by year-end

- Increasing Cash EPS to $10.90 - $11.20 per share up from $10.10 - $10.40

- Expect Same Store Sales Organic Growth of >10% for the second through fourth quarters of 2015

56.     The April 29, 2015 earnings press release quoted Pearson as stating, in part:

> *Our first quarter results demonstrate the strong performance of our diversified business model as we exceeded our first quarter guidance* despite losing $140 million in revenue and $0.12 in Cash EPS to foreign exchange headwinds. The Company delivered exceptional double digit organic growth for the third quarter in a

row, driven by the strength of most of our business units around the world.

57.   The earnings were well received by Wall Street analysts.  For example, Stifel issued a company report on Valiant placing a "Buy" rating on the stock and raising its price target from $230 to $250.

58.   Analyst Annabel Samimy wrote, "Revenues were driven by Developed Markets (double-digit growth in Dermatology/B+L/Neuro/Dental), offset by negative growth in ROW. Also despite $140 million revenue ($0.12 EPS) FX impact, Emerging Markets continued to see double-digit growth in certain regions on a same-store basis, overshadowing pockets of turmoil. Importantly, raised 2015 guidance points to revenues of $10.4-10.6 billion and Cash EPS to $10.90-11.20 (from $10.10-10.40) and stood firm in its 2016 guidance of EBITDA of $7.5 billion and 20 percent accretion from Salix Pharmaceuticals. VRX continues to successfully execute on its global expansion strategy, and with the recent acquisition of SLXP, we largely expect VRX share to trade rapidly into its combined value."

59.   Stifel continued that it believed that Valeant would maintain double-digit organic growth in its core businesses. Stifel further expected an 80 percent gross margin in Valeant's core businesses, stemming from recent product launches and the increasing prices of medications.

60.   Also on April 29, 2015, the Company issued a press release announcing that Schiller would be stepping down as CFO upon appointment of a successor. On June 11, 2015, the Company issued a press release announcing that Rosiello was appointed Executive Vice President and would take over the role of CFO from Schiller on July 1, 2015. On July 14, 2015, the Company announced it entered into a separation agreement with Schiller, effective as of June 30, 2015, regarding his positions as Executive Vice President and CFO of the Company. The press release stated that Schiller would continue to serve as a member of the board of directors and

as a consultant to the Company.

61.     On April 30, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015. The 10-Q was signed by Pearson and Schiller and contained SOX certifications signed by each of them stating that the report did not contain any untrue statements or omissions of material facts. The Form 10-Q repeated the financial results announced in the April 29, 2015 press release and made no mention of Philidor or any other specialty pharmacy affiliated with the Company.  The 10-Q also stated, in part:

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure. Within our chosen therapeutic classes and geographies, we primarily focus on durable products which have the potential for strong operating margins and sustainable organic growth. Further, we have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the Salix Acquisition and the acquisition of Bausch & Lomb Holdings Incorporated ("B&L") in August 2013, and we will continue to pursue value-added business development opportunities as they arise. The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

62.     On July 23, 2015, the Company issued a press release announcing its second quarter 2015 financial results and increasing the Company's full year 2015 guidance.  The press release reported, in relevant part:

2015 Second Quarter Results

- Total Revenue $2.7 billion; an increase of 34% over the prior year

  - Excluding negative impact of foreign exchange ($173 million) and the contribution of Salix ($313 million), revenue increased 27% over the prior year

- GAAP EPS Loss of $0.15; Cash EPS $2.56

    - Excluding negative impact of foreign exchange ($0.13) and the negative contribution of Salix ($0.04) , Cash EPS would have been $2.73, a growth rate of 43%

*       *       *

Full Year 2015 Guidance Update

- Increasing 2015 Total Revenue to $10.7 - $11.1 billion up from $10.4 - $10.6 billion

    - Salix revenue expected to be ~$1.2 billion

- Increasing 2015 Cash EPS to $11.50 - $11.80 per share up from $10.90 - $11.20 to reflect continued business outperformance and approval of IBS-D indication for Xifaxan

- Increasing Adjusted Cash Flow from Operations to greater than $3.2 billion, up from greater than $3.1 billion

- Expect Same Store Sales Organic Growth of >10% for second half of 2015

63.    The July 23, 2015 press release also quoted Pearson as stating:

> We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth. ***Our strong second quarter results were driven by outperformance in our U.S. businesses***, strong results in certain emerging markets and outstanding starts to both the Salix and Dendreon acquisitions. In addition, we have signed eight new transactions so far this year and have realized several significant R&D milestones, including the approval of Xifaxan for IBS- D and the NDA submissions for Vesneo and Relistor Oral. ***As a result, we feel confident in raising our guidance for the remainder of 2015***.

64.    On July 27, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015. The 10-Q was signed by Pearson and Rosiello and contained SOX certifications signed by each of them stating that the report did not contain any untrue statements or omissions of material facts. The Form 10-Q repeated the financial results announced in the July 23, 2015 press release and made no mention of Philidor or any other specialty

21

pharmacy affiliated with the Company. The 10-Q also stated, in part:

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure. Within our chosen therapeutic classes and geographies, we primarily focus on durable products which have the potential for strong operating margins and sustainable organic growth. Further, we have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the Salix Acquisition and the acquisition of Bausch & Lomb Holdings Incorporated ("B&L") in August 2013 (the "B&L Acquisition"), and we will continue to pursue value-added business development opportunities as they arise. The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

> \*     \*     \*

> In connection with our acquisitions, we have implemented cost-rationalization and integration initiatives to capture operating synergies and generate cost savings across the Company. These measures included:

> - workforce reductions across the Company and other organizational changes;

> - closing of duplicative facilities and other site rationalization actions company-wide, including research and development facilities, sales offices and corporate facilities;

> - leveraging research and development spend*; and/or*

> - procurement savings.

> As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and

distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. Provision balances relating to estimated amounts payable to direct customers are netted against accounts receivable, and balances relating to indirect customers are included in accrued liabilities. . . . ***Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014. The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%") and (ii) higher rebate percentages for sales to the U.S. government (including Wellbutrin XL®)*** partially offset by lower provisions (mainly rebates) associated with products acquired in the Salix Acquisition in the second quarter of 2015.

65.   On October 19, 2015, the Company issued a press release reporting its third quarter 2015 financial results. The press release reports "[t]otal [r]evenues of $2.8 billion; an increase of 36% over the prior year despite negative foreign exchange impact of $172 million" along with "GAAP EPS $0.14; Cash EPS $2.74, an increase of 30% over prior year despite the negative foreign exchange impact of $0.13 versus the prior year." The press release also announced increased fourth quarter 2015 guidance, with total revenue increased to $3.25-$3.45 billion from $3.2-$3.4 billion and EPS increased to $4.00-$4.20 from $3.98-$4.18. The Company also raised its full year 2015 guidance, with total revenue increased to $11.0-$11.2 billion from $10.7-$11.1 billion and EPS increased to $11.67-$11.87 from $11.50-$11.80. The October 19, 2015 press release quoted Pearson as stating:

> Today, we reported yet another consecutive quarter of strong financial results. I am incredibly proud of the hard work and effort put forth by Valeant's employees around the world. I would also like to thank all the doctors who prescribe our products and the patients who use them. We will be discussing our outperformance on our conference call later today, as well as addressing the most frequently asked questions we have been hearing from our shareholders. With our strong product portfolio and growth prospects, we feel very confident in

23

our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016.

66.    As set forth above, the Company hosted an earnings call on October 19, 2015 that, for the first time, shed light on the previously undisclosed and direct relationship between Valeant and certain specialty pharmacies. Also on October 19, 2015, *The New York Times* published the articled entitled "Drug Makers Sidestep Barriers on Pricing," discussed above.

67.    On October 21, 2015, Citron Research published its report entitled "Valeant: Could this be the Pharmaceutical Enron?" While revealing more information concerning Valeant's relationship with Philidor, it reveals information about how Valeant is affiliated with other undisclosed special pharmacies. The Citron report states in relevant part:

> Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about the company focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development. But no one had discussed how these drugs were distributed....until this week. On Monday morning before earnings, a report came out of SIRF, uncovering undisclosed relationships with specialty pharmas, namely Philidor RX.

68.    In short, Citron asserted that it "believes the whole thing is a fraud to create invoices to deceive the auditors and book revenue."

69.    Citron further alleged that Valeant's previously undisclosed ties to specialty pharmacies, including Philidor and R&O Pharmacy, helped the company create "phantom sales" of its products or push more product through distribution channels than sales would warrant. Citron further alleged that it appears that Valeant and Philidor have created an entire network of clones to Philidor to avoid auditor scrutiny. Citron said that it "believes the whole thing is a fraud to create invoices to deceive the auditors and book revenue."

70.    The Citron report hit shares hard shortly after 10 a.m. EDT (1400 GMT) in New

York trading and fell to a low of $88.50, before losses were cut and the stock closed down 19 percent at $118.61.

71.     Defendants' Class Period statements were materially false and misleading and omitted material information.

72.     Defendants failed to disclose the existence of an option to buy Philidor, which can be exercised at any time during the next ten years for $100 million, plus another $33 million "milestone" payments to Philidor's owners.  In turn, Philidor has option to buy Isolani, which owns a 10% equity stake and the right to acquire the remaining 90% of the equity of R&O. Under a managing services agreement with R&O, Isolani provides management and administrative services to R&O.  Under that contract, R&O compensates Isolani with all profits and losses realized by R&O.  Moreover, the contract terminates when Isolani acquires the remaining 90% of R&O.  Accordingly, defendants have failed to disclose whether Valeant owns R&O.  Defendants' Class Period statements were additionally misleading because they failed to disclose that the true purpose of the corporate structure and relationships was to circumvent pharmacy licensing rules in certain jurisdictions.  Indeed, Philidor was denied a license in California for making false statements concerning its ownership.  Philidor, however, found a way to work around the problem.  It now sells pharmaceuticals through R&O.  Additionally, Defendants failed to disclose the Company lacked adequate internal controls and that its practices exposed the Company to government sanctions related to pricing decisions and reimbursement.

## SUBSEQUENT INFORMATION

73.     On October 26, 2015, Valeant hosted a conference call.  Nearly a dozen executives, directors, and its former chief financial officer were on the call.  Instead of confronting Citron's charges in a meaningful and disciplined way, Pearson attacked Citron's

founder stating:

> "(Left's) motivation is the same as one who runs into a crowded theater and falsely yells fire. He wanted people to run," Pearson said. "He intentionally designed the report to frighten our shareholders to drive down the price of our stock so he could make money for his short-selling."

74.  Valeant, however, then stated it would form an ad-hoc committee to look into allegations related to the Company's association with specialty pharmacy Philidor. The committee includes Mason Morfit, president of one of Valeant's largest shareholders ValueAct Capital, who is rejoining the board.

75.  Valeant further disclosed in a press release later that day that it received an additional subpoena concerning payments between its Bausch & Lomb division and medical professionals.

76.  The Company also said it received a letter from the U.S. Federal Trade Commission on or about October 16 seeking more information about Valeant's recent acquisition of Paragon.

77.  The Company's explanation was unsatisfactory and presented other questions. Robert Cyran, in the *New York Times Deal Book*, commented on the Company's "opaque structure and the byzantine situation" posed by the Company's ties to the specialty pharmacies. As reported by Cyran, "Philidor has the right to buy a pharmacy called Isolani, which owns the right to buy R&O Pharmacy. Such a camouflaged trail can't sit well with investors." The article states as follows:

> Valeant Pharmaceuticals has further tangled its web. The acquisitive $39 billion company tried on Monday to explain its ties to drug distributors. Analysts didn't ask — and a 90-page presentation and call with investors didn't answer — why it had obscured the dealings in the first place. The messy details only help confirm some fears about Valeant. At issue most urgently is Philidor Rx Services, a company Valeant says it does not own or

control. Even so, Valeant paid $100 million in 2014 for an option to buy the pharmacy for nothing over the next 10 years. Nearly all of Philidor's sales are of Valeant's drugs, and Valeant consolidates its financial figures. Valeant also has the right to approve important roles at Philidor. The opaque structure is troubling. What's more, the situation is more byzantine than originally imagined. Philidor has the right to buy a pharmacy called Isolani, which owns the right to buy R&O Pharmacy. Such a camouflaged trail can't sit well with investors. The lack of clarity also makes it hard to ignore reports by The Wall Street Journal (*See* http://www.wsj.com/articles/valeants-ties-to-pharmacy-scrutinized-1445817449?alg=y) that Valeant employees used alternate identities while stationed at Philidor, and an R&O founder's claims that Philidor and subsidiaries shipped drugs to states where they did not have a license. Defenses offered by Valeant's chief executive, J. Michael Pearson, mostly ring hollow. He claims the company didn't bother disclosing the $100 million payment to buy Philidor because the matter was immaterial. That was a clear miscalculation. The nearly 40 percent fall in Valeant's stock since the relationship emerged, and a quickly assembled conference call involving the top executives, is evidence enough. Valeant will have to keep defending its dealings. The Justice Department has issued a subpoena as part of an investigation into possible violations of federal health care rules by Bausch & Lomb, a Valeant subsidiary. Prosecutors in Massachusetts and New York have opened investigations into Valeant's patient-assistance programs. And the Federal Trade Commission is investigating the company's acquisition of Paragon Holdings. The best that can be said of Valeant's unsuccessful attempt to clear the air on Monday is that it might help the company see how much more explaining it has to do.

## UNDISCLOSED ADVERSE INFORMATION

78. At all relevant times, the market for Valeant securities was open, well-developed and efficient. As a result of the materially false and misleading statements and omissions described herein, Valeant's securities traded at artificially inflated prices during the Class Period. Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information and have been damaged thereby.

79. During the Class Period, defendants materially misled the investing public,

thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material, adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

80.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and the other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false and misleading statements about the Company's true financial condition, including its operating liquidity and business prospects.  These material misstatements and omissions created an unrealistically positive assessment of Valeant and its business, prospects and operations, thus causing the Company's securities to trade at artificially-inflated levels at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially-inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

81.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

82.    Alternatively, to the extent that the statutory safe harbor does apply to any

forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time that each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Valeant who knew those statements were false when made.

## SCIENTER ALLEGATIONS

83.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

84.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Valeant, their control over, receipt and/or modification of Valeant's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Valeant, participated in the fraudulent scheme alleged herein.

85.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## LOSS CAUSATION

86.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Valeant's securities and operated as a fraud or deceit on Class Period purchasers of Valeant's securities by

failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Valeant's securities fell precipitously.  As a result of their purchases of Valeant's securities during the Class Period, Plaintiffs and the other Class members suffered significant economic losses and damages.

87.     Because defendants failed to disclose material facts concerning the Company's looming liquidity crisis, investors were not aware of the Company's true financial condition. Therefore, defendants presented a misleading picture of Valeant's business and prospects.

88.     Defendants' false and misleading statements caused Valeant's securities to trade at artificially inflated levels throughout the Class Period.  However, as a direct result of the Company's problems coming to light, Valeant's common stock price fell precipitously from its Class Period high, causing real economic loss to investors who purchased the Company's securities during the Class Period.

89.     The decline in the price of Valeant's securities after the truth came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Valeant's securities price decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss suffered by Plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Valeant's securities and the subsequent decline in the value of Valeant's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

90.     Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiffs and other members of the Class purchased the Company's securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

91.     At all relevant times, the market for Valeant securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, Valeant filed periodic public reports with the SEC;

(b)     Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Several hundreds of thousands of Valeant shares were traded on a weekly basis, demonstrating a strong presumption of an efficient market;

(d)     Valeant was followed by numerous analysts that issued reports about the Company;

(e)     New company specific information was rapidly reflected in the price of the Company's securities; and

(f)     Dozens of market makers made a market in the Company's securities.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

92.     Plaintiffs incorporate the above allegations as if fully set forth herein.

93.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Valeant securities during the Class Period.

95.     Plaintiffs and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Valeant securities. Plaintiffs and

other members of the Class would not have purchased Valeant securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

96.     Plaintiffs incorporate the above allegations as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions with the Company, and ownership of Valeant securities, the Individual Defendants had the power and authority to cause Valeant to engage in the wrongful conduct complained of herein.  Valeant controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.     Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

2.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.     Such other and further relief as the Court may deem just and proper.

KROLL HEINEMAN CARTON, LLC
*Attorneys for Plaintiffs*

*S/Seth Ptasiewicz*_____
SETH PTASIEWICZ

DATED: October 31, 2015

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

KROLL HEINEMAN CARTON, LLC
*Attorneys for Plaintiffs*

*S/ Seth Ptasiewicz*_____
SETH PTASIEWICZ

DATED: October 31, 2015

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiffs hereby certify that this matter in controversy may be the subject of the following actions:

1.     **3:15-cv-07658-MAS-LHG POTTER v. VALEANT PHARMACEUTICALS INTERNATIONAL, INC. et al;**

2.     **3:15-cv-07679-MAS-LHG CHEN v. VALEANT PHARMACEUTICALS INTERNATIONAL, INC. et al; and**

3.     **3:15-cv-07746-MAS-DEA YANG v. VALEANT PHARMACEUTICALS INTERNATIONAL, INC. et al.**

KROLL HEINEMAN CARTON, LLC
*Attorneys for Plaintiffs*

*S/ Seth Ptasiewicz*_____
SETH PTASIEWICZ

DATED: October 31, 2015

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1(d)

Plaintiffs hereby certify that the amount in controversy exceeds the sum of $150,000.00, exclusive of interest, costs and claims for punitive damages.


**KROLL HEINEMAN CARTON, LLC**
*Attorneys for Plaintiffs*

*S/ Seth Ptasiewicz*
SETH PTASIEWICZ


DATED: October 31, 2015
**OF COUNSEL:**
Albert G. Kroll, Esq. (AGK-5940)
Seth Ptasiewicz, Esq. (SP-8875)
**KROLL HEINEMAN CARTON, LLC**
Metro Corporate Campus One
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Tel: (732) 491-2100
Fax: (732) 491-2120

Benjamin Y. Kaufman, Esq. (BYK-1863)
Kevin Cooper, Esq. (KC-3244)
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653